IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

WILLIAM THOMAS BRYANT,

     Petitioner,

                             No. 12-1295

BRUCE WESTBROOKS,

     Respondent.

_____

ORDER OF DISMISSAL,
DENYING CERTIFICATE OF APPEALABILITY,
CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH
AND
DENYING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL
_____

On April 27, 2012, Petitioner, William Thomas Bryant, Tennessee Department of Correction ("TDOC") prisoner number 403113, who is currently an inmate at the Deberry Special Needs Facility ("DSNF") in Nashville, Tennessee, placed a motion seeking leave to proceed *in forma pauperis* and a petition pursuant to 28 U.S.C. § 2254, along with a memorandum in support, (the "Petition") in the prison mail system. (Mot., ECF No. 1, Pet., ECF No. 2, Mem., ECF No. 2-2.) The documents were received and filed in the United States District Court for the Eastern District of Tennessee in Chattanooga on May 1, 2012. (Pet., ECF 2 at PageID 5.) In an order entered on June 1, 2012, United States District Court Judge Curtis Collier denied leave to proceed *in forma pauperis* and directed Bryant to pay the habeas filing fee (Order, ECF No. 4), which Petitioner paid on June 20, 2012. On December 21, 2012, Judge Collier entered an order transferring the Petition to the Western District of Tennessee. (Order, ECF No. 7.) On January 3, 2013, this Court directed Respondent, Bruce Westbrooks, to file a response (Order, ECF No. 9), which was docketed on

February 26, 2013 (Resp., ECF No. 13.)  On February 27, 2013, Respondent submitted the State court record.  (R., ECF No. 14.)  Petitioner filed his reply to the response on March 22, 2013. (Reply, ECF No. 15.)

I.     STATE COURT PROCEDURAL HISTORY

In June 2005, a grand jury in Obion County, Tennessee indicted Bryant on eight counts of felony rape of a child.  (Indictment, ECF No. 14-1 at PageID 197-200.)  A jury trial began on February 21, 2006, in the Obion County Circuit Court (R., Tr. of Trial, ECF No. 14-2 at PageID 307) and, the following day, the jury found Bryant guilty of three of the eight counts, but not guilty of the remaining counts.  (R., Verdict Form, ECF No. 14-1 at PageID 253-57.)  At the sentencing hearing on March 31, 2006, the trial court sentenced him to three concurrent fifteen-year terms of imprisonment.  (R., Sentencing Tr., ECF No. 14-6 at PageID 649.)  The judgments were entered the same day.  (R., J., ECF No. 14-1 at PageID 284-91.)

On October 27, 2006, Petitioner filed a *pro se* petition pursuant to the Tennessee Post-Conviction Procedure Act, Tennessee Code Annotated §§ 40-30-101 to -122.  (R., Pet. for Post-Conviction Relief, ECF No. 14-7 at PageID 656-60.)  His attorney filed an amended petition on November 7, 2006, raising an additional allegation that trial counsel failed to file a motion for new trial, which precluded his constitutional right to an appeal.  (R., Am Pet., *id.* at PageID 665.)  A second petition was filed *pro se* by Bryant on March 26, 2007, although he was still represented by counsel.  (R., Second Am. Pet., *id.* at PageID 669-77.)  On May 18, 2007, post-conviction counsel filed a motion for new trial.  (R., Mot., *id.* at PageID 729-30.)  The trial court entered an order on May 21, 2007, granting Bryant a delayed appeal based on trial counsel's ineffective assistance and dismissed all other issues raised in the post-conviction petition without prejudice pending the direct appeal.  (R., Order, *id.* at PageID 731-33.)  On June 11, 2007, post-conviction counsel moved the

court to reconsider the May 30, 2007 order,[1] which denied the motion for new trial.  (*Id.* at PageID 734-36.)  On July 9, 2007, the post-conviction court denied the motion for new trial.[2]  (R., Order, *id.* at PageID 737.)

Bryant contended on appeal that the evidence was insufficient to convict him of rape of a child, that the trial court erred by admitting the testimony of two nurses under the hearsay exception, and that the lower court erred in finding the two child victims competent to testify.  (R., Br., ECF 14-9 at PageID 750.)  The Tennessee Court of Criminal Appeals ("TCCA") affirmed the trial court's judgments.  *State v. Bryant*, No. W2007-01340-CCA-R3-CD, 2009 WL 103967 (Tenn. Crim. App. Jan. 9, 2009), *appeal denied* (Tenn. June 15, 2009).

On August 24, 2009, Bryant commenced his second round of post-conviction proceedings by filing a *pro se* petition in Obion County Circuit Court.  (R., Pet. for Post-Conviction Relief, ECF No. 14-10 at PageID 846-54.)  On August 26, 2009, counsel was appointed to represent him.  (R., Order, *id.* at PageID 910-11.)  An amended petition was filed on February 8, 2010.  (R., Am. Pet., *id.* at PageID 917-18.)  After an evidentiary hearing, the post-conviction court denied relief on November 12, 2010.  (*Id.* at PageID 923-25.)  The TCCA affirmed.  *Bryant v. State*, No. W2010-02530-CCA-R3-PC, 2011 WL 2899068 (Tenn. Crim. App. July 20, 2011), *appeal denied* (Tenn. Nov. 17, 2011).

The facts underlying Petitioner's conviction were summarized in the opinion of the TCCA on direct appeal:

> At the trial, Obion County Sheriff's Department Investigator John Davis testified that he was contacted in early January 2005 regarding [Bryant].  Mr. Davis stated that [Bryant] was living in Obion County at Thanksgiving 2004, the time of

---

[1]The record does not include the post-conviction court's order of May 30, 2007.

[2]The order of July 9, 2007, does not reference the motion for reconsideration.

the events giving rise to the instant convictions. He stated the dates of birth of the two victims, J.B. and B.R., and said that at Thanksgiving 2004, the victims would have been five and six years old respectively.

Elizabeth Thomas testified that she was a registered nurse with several nursing degrees, including a master's degree. She said she was certified in psychological, mental health, and public health nursing. She also said she had a master's certification in medical and legal death investigation. She stated she was a professor in the nursing program at the University of Memphis. She said she had worked as a sexual assault nurse examiner at the Memphis Sexual Assault Resource Center for thirteen years. As an examiner, she was the first medical personnel that a patient would see at the center. She said that she would talk to a patient to determine the patient's medical history before taking samples for lab work and that she would then examine the patient.

Ms. Thomas testified that she examined B.R. on January 11, 2005. She said that she spoke with B.R. about her medical history and that B.R. gave her a urine sample to screen for sexually transmitted diseases. She said she conducted an examination of B.R.'s oral, genital, and rectal areas. Although there were no "findings" in either the oral or rectal areas, she said she saw one very significant finding in the genital area. In a child of B.R.'s age, the hymenal tissue should be at least two millimeters thick. She said B.R. was missing hymenal tissue that, if viewed as a clock, corresponded to the positions "5 o'clock to 11 o'clock." She stated that this lack of tissue indicated B.R. had experienced a "blunt penetrating trauma." She determined that the injury was old and that her finding would be consistent with an injury date around Thanksgiving of the previous year. She said that if the wound had been more recently inflicted, the tissue would have been bleeding, bruised, or inflamed. She said B.R.'s injury had already healed, precluding her from dating it more specifically.

Ms. Thomas testified that B.R. told her the source of her injury. Although B.R. said she was not currently in pain, she did point her finger to her genital area when the nurse asked her if she had hurt in the past. Ms. Thomas said that when she asked B.R. why that area hurt, B.R. said, "It hurt every time he stuck his finger in." The nurse said she asked B.R. if that event had occurred one time and that B.R. replied, "No, it happens every time I go over there and sleep." She said she asked the patient if she could elaborate. Ms. Thomas said that B.R. explained that every time she visited [Bryant's] house, she was told to sleep naked, and that a finger was inserted into her which hurt. She said that B.R. identified her step-uncle, [Bryant], as the perpetrator.

On cross-examination, Ms. Thomas testified that she did not diagnose B.R. with anything during the examination because she did not have the results of the urinalysis at that time. She explained that she did not swab for a semen sample because B.R. was not an emergency client but instead was referred as a child abuse

4

evaluation with "no report of any contact." She said that swabbing was not part of the protocol for that type of patient. Ms. Thomas said she did not treat B.R. for any ailment because she was an appointment patient and not an emergency case. While she stated that a blunt trauma finding could be caused by several things, she ruled out a straddle-type injury as the cause of B.R.'s lack of tissue because a straddle injury would not penetrate the hymenal tissue. She stated that viewing the opening as a clock, B.R. had some tissue "from 12 to 4" but that she had a "notch in her tissue from 4 to 5." She said that the healed injury could have occurred weeks or even months before the January appointment date.

Sally DiScenza testified that she examined J.B. She stated she was a family nurse practitioner and a nurse examiner at the Memphis Sexual Assault Resource Center. She said she obtained a master's degree in nursing, was nationally certified as a family nurse practitioner, and completed the internship program at the center. She said she had worked at the center for eleven and one-half years.

Ms. DiScenza testified that J.B. came to the center for an "assessment for sexual assault." She said that she spoke with both J.B. and her mother separately to gather J.B.'s medical history and that she subsequently examined J.B. and found abnormalities in the vaginal and anal areas. These abnormalities showed "some type of penetrative injury" to the hymenal tissue and anal areas. She stated that for a five-year-old, any wearing away of hymenal tissue indicates penetrative injury. She said that J.B. had a notch in her hymenal tissue at "4 o'clock" and that the tissue from "4 o'clock" to "11 o'clock" had been worn away. She said that J.B. also had an enlarged hymen diameter of fifteen millimeters. Ms. DiScenza stated that although the size can vary with the stature of the child, she would have expected a six- or seven-millimeter range for a child of J.B.'s age. She stated that she saw two fissures in J.B.'s anal area, a sign of damaged tissue that has healed. She said that J.B. had a dilated anus and that this was a reflexive response to penetrative injury. Furthermore, J.B. had anal "scalloping," which is indicative of healed tissue at the "border of the anal opening."

Ms. DiScenza testified that there was no way to tell what caused the penetrating injuries. She said she could not tell how old the trauma was even though J.B. had a general redness in her vaginal area, but she said these types of injuries were consistent with penetration occurring at the time of Thanksgiving 2004. She stated that problems other than recent injury, such as poor hygiene and infection, could cause this redness. She said she documented this general redness along with the patient's history of dysuria (painful urination) and recommended subsequent follow-up regarding the urinalysis results. She said that she also screened for sexually transmitted diseases.

Ms. DiScenza testified that when she was talking to J.B. about her medical history, J.B. told her how she had been injured. She stated that J.B. told her that her uncle, [Bryant], had touched her vaginal area and buttocks with his hands, once in

the front and twice in the back. She said that J.B. told her that her uncle had been naked at the time. She said J.B. responded to her questioning whether her uncle had touched her with his genitals by saying "Yes" and pointing to her front and back sides to indicate where he had touched her. Ms. DiScenza also said that this kind of contact was consistent with her physical findings.

On cross-examination, Ms. DiScenza restated that she found redness and fissures in J.B.'s anal canal and redness in her perihymenal area. In response to defense questioning whether redness indicated recent injury, she repeated that many things could cause redness and that she was unable to identify the cause. She stated that she did not collect any DNA evidence from J.B. because it was not protocol to take such evidence if an assault had occurred more than seventy-two hours before the examination. She stated that the assault giving rise to these proceedings occurred before December 25, as this was the last time the patient "had contact with a perpetrator or someone that is disclosed to have assaulted someone" as stated in her medical history. She said if she had suspected DNA were present, she would have taken a kit. She said that she did not think the redness was indicative of recent injury and that she did not swab for DNA for this reason. She stated that it was always possible that there had been DNA evidence. She also said she did not have J.B.'s clothing tested for DNA evidence.

Ms. DiScenza testified that a straddling injury would not penetrate hymenal tissue. She said it was unlikely that a child could inflict that type of injury herself. She stated she recommended J.B. for follow-up because the center had to send the sample to a laboratory to determine whether J.B. had any infections that would explain the general redness she had observed. She said the urine screens for chlamydia and gonorrhea were negative. She said that it was possible that the injuries to the hymenal tissue were caused by penile penetration and that such penetration would not completely remove all the hymenal tissue. She stated that J.B. still had hymenal tissue from "12 [o'clock] to 4 [o'clock]," where the notch was.

She stated the results of the STD screens. She stated that she referred J.B. for a follow-up visit because of her redness. She said that she did not diagnose "sexual assault" because that was a legal, and not medical, term.

Cheryl Robinson testified that she was B.R.'s mother and the cousin of J.B., who was her aunt's daughter. She said she knew [Bryant] because he was this aunt's ex-husband. She stated her daughter, B.R., stayed with [Bryant] at least one weekend a month and that J.B. often stayed with [Bryant] at the same time. She said that her daughter went to [Bryant's] home on November 23, 2004. She said he had called to ask if B.R. could visit, as J.B. was going to be there. Ms. Robinson said that he had called on other occasions to have B.R. visit him and that she did not consider this an odd request. She stated that B.R. and J.B. were at [Bryant's] home on Tuesday, Wednesday, and Thursday nights. She said [Bryant] brought the

children home on Friday. She said that since she learned of [Bryant's] actions, she had not permitted her daughter to go back to [Bryant's] home.

On cross-examination, Ms. Robinson testified that she had known [Bryant] since she was a child and that she was then thirty years old. She said she had never called [Bryant] to ask him to come get her daughter. Instead, she said it was [Bryant] who always asked to come get B.R. She stated that other children visited [Bryant], as well. Ms. Robinson said she spoke with her daughter on the telephone almost daily when B.R. was at [Bryant's] home over Thanksgiving. She denied that a government agency had removed B.R. from Ms. Robinson's home and that B.R. had been sexually assaulted by a neighbor.

Vivian Grooms testified that she worked for the Women's Resource and Rape Assistance Program. She said she was a therapist and the sexual assault coordinator for the program. She said she had been giving the two victims therapy since January 2005. She said they were making progress and that she met with them monthly. She said the therapy goal for the girls was to return them to "more normal behavior."

J.B. testified that she was six years old. She used girl and boy dolls in her testimony to show where "private parts" were and the record reflects that she pointed to the genitals and buttocks. When asked whether anyone had touched her "private parts," she said that her uncle had touched her in his bedroom in Union City when both she and B.R. were in the bedroom. Using the dolls, she indicated that her uncle had pulled down his pants and inserted his penis into her anus. She said she had not been wearing clothes at the time. She said she saw her uncle penetrate B.R. anally with his penis.

On cross-examination, J.B. testified that she had been living with a woman she called both her "auntee" and "foster mother." She also said that a man named "Tim" lived with them. She admitted that she no longer lived with them and that she had been removed from their household because she had been permitted to visit her uncle. She remembered visiting her uncle for Thanksgiving in 2004, but she did not remember how many nights she had been there. She said she was there with B.R., Akasha Lovell, and another child. She said that she did not remember what she and they had been doing but that Tarneka Jackson had taken her upstairs to bathe her along with the other children. She said that the other child and Akasha slept in the other bedroom and that she and another child slept in her uncle's bed with Tarneka. She said it was dark. She stated that she remembered telling an investigator that nothing had occurred that night. She also remembered telling the investigator that her uncle had not done anything to B.R. She said she liked her uncle. She said she was not scared when she went back to her uncle's house after Thanksgiving. She admitted that she said during the voir dire that she had once lied daily.

B.R. testified that she was eight years old. She pointed to the vaginal and chest areas of a girl doll to indicate where "private parts" were. She said that her uncle had touched her private parts while she was at his house. She said she and her cousin J.B. had been watching television in his bed. She said that her uncle was in the middle of the bed and that J.B. was on his other side. She used the dolls to show that her uncle had placed his hands on her genitals. She said that she was wearing pajamas at the time and that her uncle reached underneath them to touch her. She said she saw her uncle touching J.B., and she demonstrated, using the dolls, that her uncle touched J.B.'s genitals. She stated that no one other than her uncle had touched her in this way and that she had not been back to her uncle's house since this incident.

On cross-examination, B.R. testified that she did not remember telling an investigator that she "lied all the time." She said her uncle would take both her and J.B. to movies, skating, and Chuck E. Cheese. She said she arrived at her uncle's home the day before Thanksgiving. She said Tarneka was with her uncle when he picked her up. She stated that Tarneka and the other two girls did not get into bed with her, J.B., and the defendant. She said she could see in the bedroom because light was coming from the television. She acknowledged that she had said that [Bryant] had rubbed their "front [private] parts."

Tarneka Jackson, [Bryant's] niece, was the defense's first witness. She testified that she lived with her father and step-mother. She said she had known [Bryant] for six months, which was the amount of time she had been living in Dyer. She also had known the two victims for six months. She said [Bryant] picked her up the day before Thanksgiving and that they picked up the two victims. She said that she, [Bryant], her cousin Akasha, Akasha's children, and the two victims went grocery shopping for their holiday meal. She said that after they arrived at [Bryant's] house, she watched the children while [Bryant] and Akasha prepared the Thanksgiving meal. She described [Bryant's] apartment as having two upstairs bedrooms and a first floor with a living room, kitchen, and bathroom. She said that she and the children were downstairs and that she took them upstairs to bathe them and put them to bed in the guest bedroom. When she went to bed later, she slept in that bed with the four children. She said that Akasha came upstairs later that night but that [Bryant] did not. She said he slept on the couch downstairs. She said she fed the children on Thanksgiving after they woke up. She said that while bathing them that day, J.B. said her "privacy" was hurting. In response to her questioning, J.B. had said that she and her father had "rough played." She said that she and the girls went home after eating their Thanksgiving meal.

On cross-examination, Ms. Jackson said that she and the victims arrived at [Bryant's] house the day before Thanksgiving. She admitted that she had told an investigator that she had arrived at [Bryant's] house the previous Friday and stayed until Tuesday before returning for Thanksgiving. She admitted that she had made that statement only a few months after Thanksgiving. She stated that her trial

statement was the correct one.  She said that her uncle took her with him for his National Guard trips and that she and her uncle would share a room on these trips.  She also said that she and the victims spent Thanksgiving night at [Bryant's] home and that she went with them on Friday when they left.

Akasha Lovell, [Bryant's] daughter and mother of [Bryant's] three grandchildren, testified that her father and Tarneka had picked up the victims the night before Thanksgiving.  She drove to his house in her car with her children.  She said she was Tarneka's cousin.  She said that she, her father, and the children went grocery shopping and that she and her father prepared the meal at his house.  She stated that Tarneka was babysitting the children and prepared them for bed.  She said that she and her father had allowed Tarneka to stay up with them.  She said that everyone except herself and her father slept in the other bedroom upstairs, where there was a nightlight.  She stated that she checked on the children at one point, that she was up all night cooking, and that her father slept downstairs on the couch.  She said that B.R. was upset the following morning because the meal was not yet ready.

On cross-examination, Ms. Lovell said that she did not remember who drove her to her father's house the day before Thanksgiving.  She also claimed that she and the two victims left [Bryant's] house on Thanksgiving Day after the meal.

Laura Spears testified that she and her two sons were at [Bryant's] house for Thanksgiving.  She said that the two victims left Thanksgiving night.  She said that Ms. Lovell took her children and J.B. home and that she, her sons, [Bryant], and Tarneka Jackson drove B.R. home.  She said the two victims neither acted unusually nor complained about anything that day.

On cross-examination, Ms. Spears acknowledged that she initially told Investigator Davis in 2005 that [Bryant] had been walking around shirtless in his boxer shorts when she arrived, but that her present recollection was that [Bryant] had been wearing shorts and not just underwear.  She told Investigator Davis that Tarneka had slept with the two victims.  She stated at trial that the others had told her about their sleeping arrangements but that she had no first-hand knowledge of the arrangements because she had not been there.

[Bryant] testified that he was forty-seven years old and that he had two daughters and three grandchildren.  He said he was in the National Guard and participated in military funeral honors.  He said that he and his daughter, Akasha, organized their Thanksgiving celebration.  He said he picked up Tarneka and the two victims.  He said his daughter Akasha drove to his house with her children because his car would not accommodate so many passengers.  He said they went grocery shopping.  He said that Tarneka babysat the younger children and prepared them for bed while he and Akasha prepared the next day's meal.  He said the children slept upstairs in the two bedrooms.  He said he did not go upstairs the entire night, as he had a bathroom downstairs and had moved what he needed for the night downstairs

before the arrival of his family. He stated he never molested either victim. He stated that although he was aware J.B. had been acting unusually due to another incident, she did not do so while at this house for Thanksgiving. He said that B.R. had not acted unusually. He said it was normal for his family to come to his house and to spend the night. He said everyone went home after the Thanksgiving meal. He said that the children had returned to his house after the alleged incident and that no one had ever mentioned anything about the allegations to him.

On cross-examination, [Bryant] said he had heard the victims' testimony and could not explain what they had to gain by fabricating charges against him. He stated that J.B. had been molested by someone else, that she had told Tarneka Jackson about her symptoms at bath time, and that when Ms. Jackson informed [Bryant], he called the child's mother to inquire.

*State v. Bryant*, 2009 WL 103967, at *1-6.

## II.    PETITIONER'S FEDERAL HABEAS CLAIMS

Bryant submitted the standardized form required by Rule 2(d) of the Rules Governing § 2254 cases. The supporting facts under the four numbered issues of the form petition are, in actuality, additional issues and not supporting facts. (Pet., ECF No. 2 at PageID 9-12, 14.) His memorandum in support contains a list of twelve enumerated issues that do not correspond with those of the form petition. (Mem., ECF No. 2-1 at PageID 29-30.) The body of the memorandum contains issues not delineated in the form petition or the memorandum's list. (Mem., ECF No. 2-2 at PageID 31-126.) Much of the memorandum is disjointed and repetitive. The Court has identified sixteen discrete issues, grouped them, and renumbered them as follows:

A.    A variance existed between the indictment and the proof at trial (Pet., ECF No. 2 at PageID 9; Mem., ECF No. 2-2 at PageID 33);

B.    Petitioner's grand and petit juries were improperly impaneled due to the systematic exclusion of African Americans (Pet., ECF No. 2 at PageID 14; Mem., ECF No. 2-1 at PageID 29, ECF No. 2-2 at PageID 90-102);

C.    The trial court erred by refusing to grant expert assistance (Mem., ECF No. 2-1 at PageID 29, 39);

D. The trial court erred in sentencing Bryant without a presentence report (Mem., ECF No. 2-1 at PageID 29, ECF No. 2-2 at PageID 83-89);

E. The prosecution failed to disclose evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) (Mem., ECF No. 2-1 at PageID 29, ECF No. 2-2 at PageID 58-63, 69-74);

F. The decision of the TCCA was improper in the absence of a complete trial court record (Mem., ECF No. 2-1 at PageID 29, ECF No. 2-2 at PageID 77-81);

G. Trial counsel failed to have the victim's videotaped interviews or transcripts of those interviews admitted into evidence (Pet., ECF No. 2 at PageID 9; Mem., ECF No. 2-2 at PageID 33, 48-50);

H. Trial counsel failed to subpoena Lynn Caldwell as a witness for trial (Pet., ECF No. 2 at PageID 9; Mem., ECF No. 2-2 at PageID 33, 45);

I. Trial counsel failed to show that the State's witnesses were unreliable (Pet., ECF No. 2 at PageID 9; Mem., ECF No. 2-2, 34, 48-51);

J. Trial counsel failed to take any action during discretionary review (Pet., ECF No. 2 at PageID 10; Mem., ECF No. 2-1 at PageID 30, ECF No. 2-2 at PageID 103-18);

K. Trial counsel failed to provide Bryant with all discovery (Pet., ECF No. 2 at PageID 10);

L. Trial counsel failed to question Investigator John Davis about how Petitioner was developed as a suspect (Pet., ECF No. 2 at PageID 11);

M. Trial counsel failed to present expert testimony (Mem., ECF No. 2-1 at PageID 29, ECF No. 2-2 at PageID 54-57);

N. Appellate counsel Atnip failed to raise all meritorious claims on appeal (Pet., ECF No. 2 at PageID 12; Mem., ECF No. 2-1 at PageID 30, ECF No. 2-2 at PageID 119-20); and

O. Post-conviction counsel rendered deficient performance by failing to litigate all issues in the post-conviction petition (Pet., ECF No. 2 at PageID 15; Mem., ECF No. 2-2 at PageID 34-38, 121-26.)

Issues B, G-I, K, and M were presented to the post-conviction trial court for resolution during the post-conviction proceedings. (R., Pet. for Post-Conviction Relief, ECF No. 14-10 at

PageID 856-68, 861-64; Am. Pet. for Post-Conviction Relief, *id.* at PageID 917-18.) The same issues were presented to the TCCA in the post-conviction appeal. (R., Br. of the Appellant, ECF No. 14-12 at PageID 1015, 1017-20.) Issues A, C-F, J, L, and N-O have never been addressed by the TCCA.

## II.   LEGAL STANDARDS

The statutory authority for federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

### A.   Exhaustion and Procedural Default

Section 2254(b) and (c) provide that a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has exhausted available state remedies by presenting the same claim sought to be redressed in a federal habeas court to the state courts. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The petitioner must "fairly present"[3] each claim to all levels of state court review, up to and including the state's highest court on discretionary review, *Baldwin v. Reese*, 541 U.S. 27, 29 (2004), except where the state has explicitly disavowed state supreme court review as an available state remedy, *O'Sullivan v. Boerckel*, 526 U.S. 838, 847-48 (1999). Tennessee Supreme Court Rule 39 eliminated the need to seek review in the Tennessee Supreme Court to "be deemed to have exhausted all available state

---

[3]For a claim to be exhausted, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (internal citation omitted). Nor is it enough to make a general appeal to a broad constitutional guarantee. *Gray v. Netherland*, 518 U.S. 152, 163 (1996).

remedies[.]" *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003); *see Smith v. Morgan*, 371 F. App'x 575, 579 (6th Cir. 2010) (per curiam) ("*Adams* not only requires the federal courts to ensure that the state courts have the first opportunity to review and evaluate legal claims . . . but also mandates that the federal courts respect the duly-promulgated rule of the Tennessee Supreme Court that recognizes the law and policy-making function of that court and the court's desire not to be entangled in the business of simple error correction.").

The procedural default doctrine is ancillary to the exhaustion requirement. *See Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. *Wainwright v. Sykes*, 433 U.S. 72, 81-82 (1977); *see Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment."); *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991) (same).[4] If a claim has never been presented to the state courts, but a state court remedy is no longer available (*e.g.*, when an applicable statute of limitations bars a claim), the claim is technically exhausted, but procedurally

---

[4]"The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits." *Walker*, 562 U.S. at 315. A state rule is an "adequate" procedural ground if it is "firmly established and regularly followed." *Id.* at 316 (quoting *Beard v. Kindler*, 558 U.S. at 60-61 (2009)). "A discretionary state procedural rule . . . can serve as an adequate ground to bar federal habeas review . . . even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." *Id.* (quoting *Kindler*, 558 U.S. at 60-61) (internal citations & quotation marks omitted).

barred. *Coleman*, 501 U.S. at 731-32; *see also Hicks v. Straub*, 377 F.3d 538, 551 (6th Cir. 2004) (the procedural default doctrine prevents circumvention of the exhaustion doctrine).[5]

Under either scenario, a petitioner must show cause to excuse his failure to present the claim fairly and actual prejudice stemming from the constitutional violation or, alternatively, that a failure to review the claim will result in a fundamental miscarriage of justice. *Schlup v. Delo*, 513 U.S. 298, 320-21 (1995); *Coleman*, 501 U.S. at 750. The latter showing requires a petitioner to establish that a constitutional error has probably resulted in the conviction of a person who is actually innocent of the crime. *Schlup*, 513 U.S. at 321; *see also House v. Bell*, 547 U.S. 518, 536-539 (2006) (restating the ways to overcome procedural default and further explaining the actual innocence exception).

B.    Merits Review

Section 2254(d) establishes the standard for addressing claims that have been adjudicated in state courts on the merits:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). The petitioner carries the burden of proof for this "difficult to meet" and "highly deferential [AEDPA] standard," which "demands that state-court decisions be given the

---

[5]To avoid procedural default, federal law requires a federal habeas petitioner in Tennessee to present his federal claims to the TCCA. *Covington v. Mills*, 110 F. App'x 663, 666 (6th Cir. 2004).

benefit of the doubt." *Cullen*, 563 U.S. at 181 (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011) & *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).[6]

Review under § 2254(d)(1) is limited to the record before the state court that adjudicated the claim on the merits. *Cullen*, 563 U.S. at 181. A state court's decision is "contrary" to federal law when it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).[7] An "unreasonable application" of federal law occurs when the state court "identifies the correct governing legal principle from" the Supreme Court's decisions "but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 412-13. The state court's application of clearly established federal law must be "objectively unreasonable." *Id.* at 409. The writ may not issue merely because the habeas court, in its independent judgment, determines that the state court decision applied clearly established federal law erroneously or incorrectly. *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citing *Williams*, 529 U.S. at 411).

There is little case law addressing the standard in § 2254(d)(2) that a decision was based on "an unreasonable determination of the facts." However, in *Wood v. Allen*, 558 U.S. 290, 301 (2010), the Supreme Court stated that a state-court factual determination is not "unreasonable"

---

[6] The AEDPA standard creates "a substantially higher threshold" for obtaining relief than a *de novo* review of whether the state court's determination was incorrect. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).

[7] The "contrary to" standard does not require citation of Supreme Court cases "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam); *see Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (same); *Treesh v. Bagley*, 612 F.3d 424, 429 (6th Cir. 2010) (same).

15

merely because the federal habeas court would have reached a different conclusion.[8]  In *Rice v. Collins*, 546 U.S. 333 (2006), the Court explained that "[r]easonable minds reviewing the record might disagree" about the factual finding in question, "but on habeas review that does not suffice to supersede the trial court's . . . determination."  *Rice*, 546 U.S. at 341- 42.

The Sixth Circuit has described the § 2254(d)(2) standard as "demanding but not insatiable" and emphasizes that, pursuant to § 2254(e)(1), the state court factual determination is presumed to be correct absent clear and convincing evidence to the contrary.  *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010).  A state court adjudication will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding.  *Id.*; *see also Hudson v. Lafler*, 421 F. App'x 619, 624 (6th Cir. 2011) (same).

There is no AEDPA deference and the standards of § 2254(d) do not apply if a habeas claim is fairly presented in the state courts but not adjudicated on the merits.  *Montes v. Trombley*, 599 F.3d 490, 494 (6th Cir. 2010); *see Thompson v. Warden, Belmont Corr. Inst.*, 598 F.3d 281, 285 (6th Cir. 2010) (a claim that is fairly presented in the state court but not addressed is subject to *de novo* review by the habeas court).  The pre-AEDPA *de novo* review standard applies for questions of law and mixed questions of law and fact, and the clear error standard applies to factual findings.  *Montes*, 599 F.3d at 494.

---

[8]In *Wood*, the Supreme Court granted certiorari to resolve whether, to satisfy § 2254(d)(2), "a petitioner must establish only that the state-court factual determination on which the decision was based was 'unreasonable,' or whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption that the determination was correct with clear and convincing evidence."  *Wood*, 558 U.S. at 291.  The Court ultimately found it unnecessary to reach that issue, and left it open "for another day."  *Id.* at 300-01, 303-04 (citing *Rice v. Collins*, 546 U.S. 333, 339 (2006) in which the Court recognized that it is unsettled whether there are some factual disputes to which § 2254(e)(1) is inapplicable).

C.    Ineffective Assistance

A claim that ineffective assistance of counsel has deprived a defendant of his Sixth Amendment right to counsel is controlled by the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). The benchmark for judging any claim of ineffectiveness is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

To demonstrate deficient performance by counsel, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688.

> A court considering a claim of ineffective assistance must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance. The challenger's burden is to show that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment.

*Harrington*, 562 U.S. at 104 (citing *Strickland*) (internal citations & quotation marks omitted).

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.[9] "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding. Counsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Harrington*, 562 U.S. at 104 (citing *Strickland*, 466 U.S. at 687, 693) (internal citations & quotation marks omitted); *see also Wong v. Belmontes*, 558 U.S. 15, 27 (2009) (per curiam) ("But *Strickland* does not require the State to 'rule

---

[9]"[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant[.]" *Strickland*, 466 U.S. at 697. If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. *Id.*

out'" a more favorable outcome to prevail. "Rather, *Strickland* places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different").

> Surmounting *Strickland*'s high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.

*Harrington*, 562 U.S. at 105 (internal citations & quotation marks omitted).

The deference to be accorded a state-court decision is magnified when reviewing an ineffective assistance claim under 28 U.S.C. § 2254(d):

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both highly deferential and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* (internal citations & quotation marks omitted).

IV.    ANALYSIS OF PETITIONER'S CLAIMS

A.    Issues Barred by Procedural Default: A, C-F, J, L, and N-O

Petitioner did not properly exhaust Issues A, C-F, J, L, N, and O. They were never presented to the state courts for resolution. Thus, Issues A, C-F, J, L N, and O have been exhausted through Bryant's procedural default and he has no avenue remaining for presentation of these

claims given the state statute of limitations on state post-conviction relief. This procedural default operates as a complete and independent procedural bar to federal habeas review of Issues A, C-F, J, L, N, and O.

1.  Issue N:  Appellate Counsel's Failure to Raise Issues A and C-F on Direct Appeal

In Issue N, Bryant alleges that appellate counsel provided ineffective assistance by failing to raise all meritorious claims on appeal. (Pet., ECF No. 2 at PageID 12; Mem., ECF No. 2-1 at PageID 30, ECF No. 2-2 at PageID 119-290.) The Court construes this allegation as the inmate's attempt to demonstrate cause for the complete default of Issues A and C-F. His claims of ineffective assistance of appellate counsel cannot establish cause for his procedural default, however, because those claims are also procedurally defaulted. The Supreme Court has explained that, even though ineffective assistance of counsel can be cause for a procedural default, the exhaustion doctrine, which is "principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings," generally requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default. *See Murray v. Carrier*, 477 U.S. 478, 488-89 (1986).

Petitioner did not avail himself of his post-conviction remedies to exhaust any claims of ineffective assistance by his appellate attorney. "[A]ttorney error cannot constitute cause where the error caused a petitioner to default in a proceeding in which he was not constitutionally entitled to counsel, *e.g.* a discretionary appeal or state post-conviction proceeding." *Riggins v. Turner*, No. 95-4027, 1997 WL 144214, at *2 (citing *Coleman*, 501 U.S. at 751-53). Bryant has not established cause and prejudice for his procedural default and presents no tenable claim of factual innocence.

Thus, he cannot avoid the procedural bar erected by the state post-conviction statute of limitations and cannot seek federal habeas relief on Issues A, C-F and N.

        2.    <u>Issue O:  Post-conviction Counsel's Failure to Litigate All Issues Raised in the Post-conviction Petition</u>

Issue O alleges that post-conviction counsel performed deficiently by failing to litigate all issues raised in the post-conviction petition.  Bryant was provided an evidentiary hearing and an opportunity to present testimony on all issues raised in the post-conviction petition.  Issues J and L were not raised in the appeal of the denial of post-conviction relief.  "There is no constitutional right to an attorney in state post-conviction proceedings.  Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." *Coleman*, 501 U.S. at 752 (internal citations omitted).  Attorney error cannot constitute "cause" for a procedural default "because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must bear the risk of attorney error." *Id.* at 753 (internal quotation marks omitted).  Thus, where the state has no constitutional obligation to ensure that a prisoner is represented by competent counsel, the petitioner bears the risk of attorney error. *Id.* at 754.[10]

In 2012, the Supreme Court issued its decision in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), which recognized a narrow exception to the rule stated in *Coleman* "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding." *Martinez*, 132 S. Ct. at 1320.  In such cases, "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance of counsel if, in the

_____

[10]*See also* 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.").

initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Id.* The Supreme Court also emphasized that

> [t]he rule of *Coleman* governs in all but the limited circumstances recognized here . . . . It does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial, even though that initial-review collateral proceeding may be deficient for other reasons.

*Id.* (internal citations omitted). The requirements that must be satisfied to excuse a procedural default under *Martinez* are as follows:

> (1) the claim of ineffective assistance of trial counsel was a substantial claim; (2) the cause consisted of there being no counsel or only ineffective counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the initial review proceeding in respect to the ineffective-assistance-of-trial-counsel claim; and (4) state law *requires* that an ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 133 S. Ct. 1911, 1918 (2013) (alteration in original) (internal quotation marks omitted).

*Martinez* arose under an Arizona law that did not permit ineffective assistance claims to be raised on direct appeal. *Martinez*, 132 S. Ct. at 1313. In its subsequent decision in *Trevino*, the Supreme Court extended its holding in *Martinez* to states in which a "state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal[.]" *Trevino,* 133 S. Ct. at 1921. Thus, the decision in *Trevino* modified the fourth requirement stated by *Coleman* for overcoming a procedural default.

Ineffective assistance of state post-conviction counsel can establish cause to excuse a Tennessee prisoner's procedural default of a substantial federal habeas claim that his trial counsel was constitutionally ineffective. *See Sutton v. Carpenter*, 745 F. 3d 787, 795-96 (6th Cir. 2014). To be "substantial," a claim must have "some merit" based on the controlling standard for

ineffective assistance of counsel. *Martinez*, 132 S. Ct. at 1318-19. For the reasons explained below, Petitioner has not shown a substantial claim of ineffective assistance of counsel.

### 3. Issue J: Trial Counsel Failed to Take any Action During Discretionary Review

Bryant alleges post-conviction counsel was ineffective for failing to present and appeal a claim that trial counsel failed to take any action during discretionary review (Pet., ECF No. 2 at PageID 9; Mem., ECF No. 2-2 at PageID 34, 53-54). Even though *Martinez* and *Trevino* are applicable to Tennessee cases, any allegation that Petitioner's state post-conviction counsel was ineffective on appeal or ineffective for any other reason than failing to raise a meritorious trial counsel error, does not warrant any consideration in this proceeding. *See Martinez*, 132 S. Ct. at 1319.

Petitioner was granted a delayed appeal because trial counsel did not seek permission from the trial court to withdraw from the case or inform the trial court that another attorney would be representing Petitioner on appeal. (R., Order, ECF No. 14-7 at PageID 731-33.) The trial court record demonstrates that a different attorney was appointed to perfect Petitioner's appeal. *State v. Bryant*, 2009 WL 103967. The appellate attorney briefed Petitioner's appeal (R., Br., ECF No. 14-9 at PageID 747-64), filed a reply (R., Reply Br., *id.* at PageID 793-801), motion to rehear (R., Mot., *id.* at PageID 815-20), and an application for permission to appeal. (R., *id.*, Appl. at PageID 824-39.)

At the hearing on the second round of post-conviction proceedings, Bryant attempted to relitigate the claim that his trial attorney performed deficiently by failing to file a motion for new trial. The post-conviction court held that he had been provided all relief to which he was entitled on this claim. (R., Order, ECF No. 14-10 at PageID 925.) Petitioner cannot establish further prejudice

from counsel's failure to take action after the conclusion of the trial.  This attempt to relitigate the issue is without merit.

4.    Issue L:  Trial Counsel Failed to Question Investigator John Davis About How Bryant was Developed as a Suspect

Bryant alleges post-conviction counsel was ineffective for failing to present and appeal a claim that trial counsel failed to question Investigator John Davis about how Bryant was developed as a suspect.  (Pet., ECF No. 2 at PageID 11.)  Davis testified that he was contacted by Lynn Caldwell with the Dyer County Department of Children's Services (R., Trial Tr., ECF No. 14-2 at PageID 316), who had been alerted by a Dyer County Head Start Supervisor (*id.* at PageID 317).  Trial counsel chose not to cross-examine Davis.  (*Id.* at PageID 319.)

Petitioner has not provided any affidavit or document that demonstrates Davis' testimony was untruthful.   He has neither submitted substantial credible evidence demonstrating trial counsel's strategic decision to forego cross-examination amounts to deficient performance nor sufficient evidence of prejudice to make a successful *Strickland* ineffective assistance of counsel claim.  The failure to cross-examine Davis does not equate to deficient performance.  Bryant has not demonstrated that this tactical decision fell below an objective standard of reasonableness.  *See Strickland*, 466 U.S. at 688.  When evaluating counsel's performance, the Court is mindful of the *Strickland* Court's instructions that "[t]here are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way."  *Id.* at 689.  Consequently, Petitioner has not presented any credible proof from which the Court may conclude counsel performed deficiently and, as a result, Petitioner was prejudiced. *Martinez* and *Trevino* cannot excuse Petitioner's default of this claim.

Bryant is not entitled to *Martinez* and *Trevino* relief for Issues J, L, and O. He has not presented any evidence to justify review of these claims to prevent a fundamental miscarriage of justice. *See Murray*, 477 U.S. at 495-96.

In summary, Issues A, C-F, J, L, and N-O are barred by Petitioner's procedural default.

**B.** <u>Exhausted Issues</u>

The remaining issues were addressed by the TCCA after the post-conviction trial court denied relief. The TCCA summarized the testimony from Bryant's post-conviction evidentiary hearing:

> The petitioner filed a timely petition for post-conviction relief. Following the appointment of counsel, the petitioner filed an amended petition claiming that his convictions resulted from an unconstitutionally empaneled jury and the ineffective assistance of counsel. Specific to his ineffective assistance of counsel claim, the petitioner alleged that trial counsel failed to object to the jury composition, failed to review all discovery materials with the petitioner, failed to interview and present witnesses, failed to obtain an expert to rebut the State's experts, and failed to preserve his right to an appeal by neglecting to file a motion for new trial.
>
> At the evidentiary hearing, the petitioner testified that only four African-Americans were summoned for jury duty in his case, and he claimed that, before voir dire began, "the judge called them up one at a time to the podium and dismissed them. We don't know why." The petitioner said that he asked trial counsel why the judge had removed all the African-American jurors and that counsel did not know and "left it at that." The petitioner opined that the exclusion of the jurors violated "a right, a constitutional right" and that he thought it would have made a difference had the African-American jurors not been excluded from the venire. The petitioner, through counsel, admitted that there was no proof in the record to substantiate his claim, either in the form of challenge notes or transcripts of bench conferences.
>
> The record reveals that the petitioner retained two attorneys to represent him at trial. At the evidentiary hearing, the petitioner contended that trial counsel failed to review discovery materials with him prior to trial and that, therefore, trial counsel did not adequately cross-examine several State witnesses. The petitioner, without presenting any testimony at the evidentiary hearing from the purported witnesses, claimed that many of the witnesses testified inconsistently to their initial statements made to investigators. The petitioner also testified that trial counsel were deficient by not presenting his sister and father as witnesses at trial. The petitioner, however, did not present either as witnesses at the evidentiary hearing. The petitioner claimed

that trial counsel were deficient in not obtaining and presenting an expert witness to rebut the State's expert testimony concerning evidence of sexual abuse suffered by the victims. Again, the petitioner did not present any purported expert witness at the evidentiary hearing.

Only one of the petitioner's trial attorneys testified at the evidentiary hearing. Regarding the petitioner's allegation concerning the trial court's exclusion of African-American jurors from the venire, trial counsel denied that such a thing had occurred and said, "I can't imagine that happening with me sitting at counsel table . . . I would have taken great offense to that." Trial counsel further recalled that the petitioner "never" objected or complained about the composition of the jury.

Trial counsel refuted the petitioner's claim that he failed to discuss discovery issues with the petitioner and said that he "went over those [witness's statements] with [the petitioner] time and time again." He recalled that the petitioner's sister was initially a cooperative witness but then changed, so he decided not to call her as a witness at trial. Trial counsel said that co-counsel, who was also a registered nurse, conducted a very thorough cross-examination of the State's experts. Counsel also testified that he did consult an expert with the hope of rebutting the State's expert testimony evidence concerning the evidence of sexual abuse. Trial counsel testified, however, that the expert told him, "'You don't want to hear what I have got to say.'" Trial counsel admitted that some confusion occurred about representation on appeal leading to the motion for new trial not being filed. He also recalled that the petitioner had told him not to file an appeal. Nevertheless, trial counsel said that the trial court had granted the petitioner a delayed appeal.

At the conclusion of the evidentiary hearing, the post-conviction court made findings of fact concerning the petitioner's claims. Regarding the petitioner's jury claim, the post-conviction court stated that the petitioner's testimony was "not believable"; and, even if believed, without any statistical evidence or evidence from the trial record to support his claims, the petitioner had failed to show a systematic exclusion of African-American jurors from the Obion County venire. Regarding the allegations of ineffective assistance of counsel, the post-conviction court found that the petitioner's testimony and trial counsel's testimony were "totally different" and that trial counsel's testimony was "in direct conflict" with that of the petitioner. Ultimately, the post-conviction court ruled that the petitioner failed to establish any prejudice flowing from his allegations of deficient performance. Accordingly, the post-conviction court denied relief.

*Bryant v. State*, 2011 WL 2899068, at *1-2.

The TCCA reviewed Petitioner's claims under the following standards:

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or

voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." [Tenn. Code Ann.] § 40-30-103 (2006). The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. *See* [Tenn. Code Ann.] § 40-30-110(f) (2006). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

  To establish entitlement to post-conviction relief via a claim of ineffective assistance of counsel, the post-conviction petitioner must affirmatively establish first that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and second that his counsel's deficient performance "actually had an adverse effect on the defense," *Strickland []*, 466 U.S. [at] 693[]. In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

  When reviewing a claim of ineffective assistance of counsel, we will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

  Claims of ineffective assistance of counsel are mixed questions of law and fact. *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6, S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the post-conviction court's factual findings, our review is *de novo*, and the post-conviction court's conclusions of law are given no presumption of correctness. *Fields*, 40 S.W.3d at 457–58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

*Id.* at *3-4.

The TCCA denied relief, stating:

In our view, the record fully supports the findings of fact and conclusions of law of the post-conviction court. The petitioner's testimony at the evidentiary hearing concerning the composition of the jury venire consisted of nothing more than mere allegations. Bare conclusory allegations, unsupported by evidence, will not suffice to establish a claim for post-conviction relief. *See, e.g., William A. Hawkins v. State*, No. E2010–00795–CCA–R3–PC, slip op. at 3 (Tenn. Crim. App., Knoxville, Jan. 4, 2011). Likewise, the petitioner's allegations concerning the cross-examination and presentation of witnesses were simply allegations unsupported by any witness testimony. This court has repeatedly advised that in the absence of the testimony of the purported witness, a court cannot speculate upon the substance of any testimony that a petitioner claims would have made a difference had it been presented at trial. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) (holding that a post-conviction petitioner generally fails to establish his claim that counsel did not properly investigate or call a witness if he does not present the witness to the post-conviction court because a post-conviction court may not speculate "on the question of . . . what a witness's testimony might have been if introduced" at trial). As such, the petitioner failed to establish his claims by clear and convincing evidence in order to merit post-conviction relief. The order of the post-conviction court is affirmed.

*Id.* at *4.

1. Issue B: Unconstitutional Jury

Petitioner contends that his jury was improperly impaneled due to the systematic exclusion of African-Americans. (Pet., ECF No. 1 at PageID 14; Mem., ECF No. 2-1 at Page ID 29, ECF No. 2-2 at PageID 90-102.) The supporting factual basis for this claim consists of the statement that the petit jury has occupied a central position in our system of justice by safeguarding a person accused of a crime against the arbitrary power by a prosecutor or judge. (Pet., ECF No. 1 at PageID 14.) Bryant contends, in the memorandum, that unconstitutional impaneling

has happened before, during, and after he was indicted and tried in this county, and his allegations are sustained by census by race and gender of registered voters and the records used and the composition of the members over a period of sustained years.

The Abuse can be demonstrated by the records held in the **Clerk's** and **Commission's Office** and by their testimony. The disparity is large and it is unlikely this is by **chance** or **accident** and the absence of evidence to the contrary to

either **racial** or **class** is established by a statistical and testimonial showing.  **See Exhibits F, G**

(Mem., ECF No. 2-2 at PageID 90.)  Exhibit F is Petitioner's request for a listing of his jury panel and request for information about whether those jurors had served in a previous criminal case. (ECF No. 2-3 at PageID 154.)  Exhibit G is the Obion County Circuit Court Clerk's reply, listing each member of the jury and stating that none of the jurors had served on a previous criminal court jury.  (*Id.* at PageID 155.)  An unidentified person had written "white" by each juror's name and the statement "All white and no blacks."  (*Id.*)

Bryant contends the truth of his allegations can be demonstrated by "the records of the procedures along with the compositions of past bodies are placed upon the record and addressed by testimony" from the post-conviction hearing.  (Mem., ECF No. 2-2 at PageID 92.)  He alleges that

> the County of Obion, with its cross-section, percentage wise, of blacks on the venire panel was grossly inadequate in that only four blacks passed through as prospective jurors, although the population of Obion County was at least one-fourth blacks, according to reliable information learned by [Petitioner's] counsel, not including Asians and Pacific Islanders and Native Americans, which had a reasonable population 9.8 percent of Blacks so that the venire jury would not have been affected, but as is the case, it was affected.
>
> Petitioner respectfully asserts that during the selection of the Petit jury the prosecution applied a systematic exclusion of Blacks present, which that exclusion is a violation of Equal Protection. . .

(*Id.* at PageID 97.)

He further claims that "he can prove by showing of the record, the establishment of purposeful discrimination in selection of petit jury was prejudicial and biased toward the Petitioner in receiving a fair trial, and trial counsel's failure to move to discharge the jury on the ground of prosecutor's removal of blacks from the jury was clearly a violation of Petitioner's rights under the

Sixth and Fourteenth Amendments of the U.S. Constitution." (*Id.* at PageID 98.) Bryant asserts that

> the Venire in his case, with only having four (4) blacks who were challenged by the Prosecution and ultimately dismissed, violating the mandate and language of **Batson** and/or the "fair cross-section claim[,"] is indeed a violation of the Due Process of law and a violation of Equal Protection of the Law. The Petitioner is a Black individual that was convicted by an All-White-Jury. The Prosecution had no intention of allowing the Petitioner a fair trial, much less one with a "fair cross-section" of the community being a part of his petit jury in the case. This is flat-out "discrimination[,"] no doubt about it.

(*Id.* at PageID 100.) The State responds that Petitioner failed to provide evidence to support his claim, therefore the decision of the TCCA was not contrary to, or an unreasonable application of, clearly established federal law, nor an unreasonable determination of the facts in light of the evidence. (Resp., ECF No. 13 at PageID 188.)

Because the Petition does not address the standards for evaluating habeas claims on the merits, it is unclear whether Bryant contends that the decision of the TCCA on this issue was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or whether it "was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding," *id.* § 2254(d)(2).

The Court has reviewed the transcript of voir dire. (R., Tr. of Voir Dire, ECF No. 14-5.) The Court called twenty-four names as prospective jurors: Glen Mosier, Sherry Wiley, Robert Ransom, Deanna Petty, Devenda Summers, David Tomlinson, Jessie Livingston, Anita Roleson, Mark Napier, Victoria Wilkinson, Lois Milligan, Christopher Walton, Cynthia Carroll, Merany Norrid, Betty Pear, Scott Caudill, Priscilla Morris, Mark Bell, Wilma Edmison, Linda Todd, Stephanie Chappell, Jettie Stuart, James Barber, and Mark Pierce. (*Id.* at PageID 591.) The record

does not reflect the races of the prospective jurors. (*Id.*) The Court excused Napier for cause because Napier's father had suffered a stroke the day before the trial. (*Id.* at PageID 606.) The Court excused Roleson and Wilkinson because they stated they would have problems being impartial based on the nature of the alleged crimes. (*Id.* at PageID 609-12, 630.) Defense counsel and the State exercised their preemptory challenges to excuse Wiley, Carroll, Ransom, Summers, Mosier, and Petty. (*Id.* at PageID 615-19.) Defense counsel did not object to the Court's decision to dismiss the three prospective jurors for cause or to the State's use of preemptory challenges. No objections were raised about the racial composition of the jury or the race of any prospective juror who was dismissed. The record does not reflect the ultimate racial composition of the jury.

Petitioner testified at the post-conviction hearing that four African-Americans were in the courtroom, that the judge called them to the bench one at a time, that neither attorney approached the bench or objected, and that those four African-Americans left before voir dire began. (R., Tr. of Post-Conviction Hr'g., ECF No. 14-11 at PageID 941-46.) He does not repeat those allegations in this proceeding. Defense counsel refuted the allegations at the post-conviction hearing, stating: "I can't imagine that happening with me sitting at counsel table and a judge bringing up individuals and summarily dismissing them from the jury panel. . . . I would have taken great offense to that. . . . Or at least I would want – I would have wanted to have interjected my opinion about that." (*Id.* at PageID 983-84.) Bryant admitted during cross-examination that he had no evidence that Obion County did not follow correct and proper procedures in summoning the venire. (*Id.* at PageID 974.)

The Supreme Court has held that "[t]he Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community," *Berghuis v. Smith*, 559 U.S. 314, 319 (2010), but has not held that a defendant is entitled to a jury of any particular racial composition. The record does not demonstrate that

African-Americans were not summoned in the venire or that they were excused by the judge or prosecution. A defendant asserting a Sixth Amendment violation in the composition of the jury pool must demonstrate that (1) the group alleged to be excluded is a distinctive group in the community; (2) the representation of this group is not fair and reasonable; and (3) the underrepresentation was due to a systematic exclusion of the group in the selection process. *Duren v. Missouri*, 439 U.S. 357, 364 (1979). Petitioner has not met the standard set forth in *Duren* because he has presented no evidence of "systematic exclusion" of African-Americans.

The racial composition of the jury that was chosen, standing alone, is insufficient to establish a constitutional claim. Speculation is insufficient to satisfy Bryant's burden of demonstrating that the TCCA's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding," *id.* § 2254(d)(2). No evidence was presented to support this claim. The issue is without merit and is DENIED.

2.     <u>Issues G-I and K: Trial Counsel's Failure to Admit the Victim's Videotaped Interviews or Transcripts as Evidence, Failure to Subpoena Lynn Caldwell for Trial, Failure to Show that the State's Witnesses were Unreliable, and Failure to Provide Bryant with all Discovery</u>

Petitioner alleges that trial counsel "should have entered the interview videotapes or witnesses [sic] statement transcripts . . . as exhibits . . . at the trial." (Pet., ECF No. 2 at PageID 9; Mem., ECF No. 2-2 at PageID 33, 48-50.) He insists that trial counsel should have subpoenaed Caldwell, the victims' interviewer, as a trial witness. (Pet., ECF No. 2 at PageID 9; Mem., ECF No. 2-2 at PageID 33, 45.) He also contends that trial counsel failed to provide him with all

discovery materials. (Pet., ECF No. 2 at PageID 10.) Bryant asserts that trial counsel failed to demonstrate that the State's witnesses were unreliable. (Mem., ECF No. 2-2, 34, 48-51.)

The State has responded to these claims stating that

[b]ased on the evidence in the record, the court's determination as to Bryant's claim was not contrary to, or an unreasonable application of, clearly established federal law as decided by the United States Supreme Court, nor an unreasonable determination of the facts in light of the evidence. The Court of Criminal Appeals applied the proper *Strickland* standard prior to its analysis, and its determination [ ] that Bryant had not stated a factual basis upon which he could support his claims was supported by the record.

(Resp., ECF No. 13 at PageID 187.)

In affirming the post-conviction trial court's findings of fact and conclusions of law, the TCCA cited and applied the Supreme Court's decision in *Strickland*. *Bryant v. State*, 2011 WL 2899068, at *3-4. The Tennessee courts determined that Bryant failed to present evidence or witnesses to support his allegations and failed to establish his claims by clear and convincing evidence. *Id.* at *4.

The inmate does not explain how the decision of the TCCA was contrary to *Strickland*. He has failed to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Petitioner has not satisfied his burden of showing that the decision was objectively unreasonable.

Bryant repeats the allegations found in the post-conviction petitions (R., Pet., ECF No. 14-10 at PageID 846-54, Am. Pet., *id.* at PageID 917-18) and the post-conviction appellate brief (R., Br. of the Appellant, ECF No. 14-12 at PageID 1017, 1020). He fails to address the decision of the TCCA or to identify any defect in the State court's reasoning. Based on this Court's review of the transcript of Petitioner's trial (R., Tr. of Trial, ECF No. 14-3 at PageID 409-516, ECF No. 14-4 at PageID 517-85), and the transcript of the post-conviction hearing, (R., Tr. of Post-Conviction Hr'g.,

ECF No. 14-11 at PageID 929-1008), the determination of the TCCA was not an unreasonable determination of the facts.

During the post-conviction hearing, Bryant did not maintain that he wanted the victims' videos and transcripts admitted into evidence; instead, he testified that he was not provided with copies of the videos and transcripts and did not review them until after the trial. (R., Tr. of Post-Conviction Hr'g., ECF No. 14-11 at PageID 946-48.) His attorney related that he spent days going over the videos and transcripts because they were largely unintelligible and unreadable. (R., Tr. of Post-Conviction Hr'g., *id.* at PageID 986-87, 992.) Counsel's testimony that he went over the witnesses' statements "with [Bryant] time and time again" and that he ran down and interviewed all possible witnesses (*id.* at PageID 984-88); that he gave his client copies of the victims' videotapes and transcripts; and that Caldwell was not a potential witness because she was hostile to the defense (*id.* at PageID 992-94) is credible. Petitioner did not present the victims' videos or provide the victims' transcripts during the post-conviction hearing and has not presented the videos and transcripts in this forum. Because he failed to call any witnesses or provide evidence to support his allegations during the post-conviction proceedings, the Court is left to guess what specific testimony or evidence he might have offered and how it would have affected the outcome of the proceedings. A defendant's conclusory allegations about the testimony of uncalled witnesses is insufficient to demonstrate prejudice. *Adams v. Jago*, 703 F.2d 978, 981 (6th Cir. 1983). Petitioner has failed to establish deficient performance by counsel. These claims are without merit and are DENIED.

### 3. Issue M: Trial Counsel's Failure to Present Expert Testimony

Bryant contends that counsel performed deficiently by failing to employ a doctor or psychologist as a defense expert for trial. (Mem., ECF No. 2-2 at PageID 54-57.) The State

responds that the TCCA's decision rejecting this issue correctly identified the governing legal standard and was not based on an unreasonable determination of the facts. (Resp., ECF No. 13 at PageID 186-87.)

Trial counsel testified during the post-conviction hearing that he hired a social worker to assist with understanding the videotapes of the victims' interviews and consulted with Dr. Johnny Welch who wrote the State's format for sexual abusers and pedophiles (Tr. of Post-Conviction Hr'g, ECF No. 14-11 at PageID 986-88.) Counsel stated that when he asked the consultant if he could come up with anything that would help the defense, Dr. Welch replied, "You don't want to hear what I've got to say." (*Id.* at PageID 988.) The attorney recalled that co-counsel was a registered nurse, went through the nurses' reports in detail, and made substantial headway during the cross-examination of those witnesses. (*Id.* at PageID 988-89.) Counsel believed that co-counsel's abilities on cross-examination were the reason Bryant was acquitted on all but three counts. (*Id.*) The post-conviction trial court determined that:

> The proof in this case is that the State had expert witnesses in the field of nursing and psychology that interviewed the children involved . . . . The petitioner shows no particular expert that should have been used, nor that there was any expert available that could have changed the outcome of this trial. One of the attorneys involved in this case is a registered nurse in addition to being an attorney. The petitioner also fails to show any prejudice on this issue.

(R., Order, ECF No. 14-10 at PageID 924.) The TCCA cited and applied the Supreme Court's decision in *Strickland*. *Bryant v. State*, 2011 WL 2899068, at *3-4.

The inmate does not explain how the decision of the TCCA was contrary to *Strickland*. He has failed to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. He has not satisfied his burden of showing that the decision was objectively unreasonable. He also does not

provide argument or evidence that refutes the presumption of correctness accorded the State court's determination. A state court's factual findings are entitled to a presumption of correctness in the absence of clear and convincing evidence to the contrary. 28 U.S.C. §§ 2254(d)(2), 2254(e)(1).

Based on this Court's review of the transcript of Petitioner's trial (R., Tr. of Trial, ECF No. 14-3 at PageID 409-516, ECF No. 14-4 at PageID 517-85) and the transcript of the post-conviction hearing (R., Tr. of Post-Conviction Hr'g., ECF No. 14-11 at PageID 929-1008), Petitioner has failed to establish deficient performance by trial counsel or prejudice from the absence of a defense expert witness. Bryant failed to call a doctor or psychologist as a witness during the post-conviction proceedings. He did not provide an expert affidavit or deposition with an opinion that would have assisted the defense. He cannot demonstrate either deficient performance or an unreasonable determination of the facts with conclusory allegations and speculation. This claim is also without merit and is DENIED.

The issues raised in the Petition are barred by procedural default and without merit. The Petition is DISMISSED WITH PREJUDICE. Judgment shall be entered for Respondent.

## V. APPELLATE ISSUES

There is no absolute entitlement to appeal a district court's denial of a § 2254 petition. *Miller-El v. Cockrell*, 537 U.S. 322, 335 (2003); *Bradley v. Birkett*, 156 F. App'x 771, 772 (6th Cir. 2005). The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner. Rule 11, Rules Governing Section 2254 Cases in the United States District Courts. A petitioner may not take an appeal unless a circuit or district judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).

A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right, and the COA must indicate the specific issue or issues that satisfy the required

showing. 28 U.S.C. §§ 2253(c)(2) & 3. A "substantial showing" is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El*, 537 U.S. at 336 (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)); *Henley v. Bell*, 308 F. App'x 989, 990 (6th Cir. 2009) (per curiam) (same). A COA does not require a showing that the appeal will succeed. *Miller-El*, 537 U.S. at 337; *Caldwell v. Lewis*, 414 F. App'x 809, 814-15 (6th Cir. 2011) (same). Courts should not issue a COA as a matter of course. *Bradley*, 156 F. App'x at 773 (quoting *Slack*, 537 U.S. at 337).

In this case, there can be no question that the claims in the Petition are noncognizable, barred by procedural default, and without merit. Because any appeal by Petitioner on the issues raised in the Petition does not deserve attention, the Court DENIES a COA.

In this case for the same reasons the Court denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith. It is therefore CERTIFIED, pursuant to Fed. R. App. P. 24(a), that any appeal in this matter would not be taken in good faith, and leave to appeal *in forma pauperis* is DENIED.[11]

Entered this 5th day of January 2016.

s/ J. DANIEL BREEN
CHIEF UNITED STATES DISTRICT JUDGE

---

[11]If Petitioner files a notice of appeal, he must pay the full $505 appellate filing fee or file a motion to proceed *in forma pauperis* and supporting affidavit in the Sixth Circuit Court of Appeals within thirty days of the date of entry of this order. *See* Fed. R. App. P. 24(a)(5).